**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------- X
BRITTANIE MCGEE,                                             :
                                                             :
                                 Plaintiff,                  :        Civil Action No.
                                                             :
            v.                                               :
                                                             :        **COMPLAINT**
BLACKROCK, INC.,                                             :
                                                             :
                                 Defendant.                  :        **Jury Trial Demanded**
------------------------------------------------------------- X

Plaintiff Brittanie McGee ("Plaintiff" or "McGee"), as and for her claims against

BlackRock, Inc. ("Defendant," "BlackRock" or the "Firm") hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      In the aftermath of 2020's social justice protests, BlackRock – the world's largest

asset manager – went to great lengths to tout its "commitment to racial equality and inclusion."

2.      Larry Fink, the Firm's Chairman and Chief Executive Officer, applauded the Firm

for "engaging in a powerful dialogue" to "help drive real change" and for "moving forward with

a sense of purpose and resolve."   Fink announced that BlackRock had an "action plan" that

included a "goal" to hire and promote more Black professionals in the future.

3.      Fink's expertly crafted announcement – which was met with considerable fanfare

– portrayed BlackRock as a benevolent corporate citizen fighting for, in Fink's words, a "better,

fairer society."

4.      In contrast to the image BlackRock seeks to portray, the Firm has serious race and

sex discrimination problems of its own making.  The Firm employs over 16,000 people worldwide.

However, only five percent are Black.  Even fewer – only three percent – of the Firm's senior

leaders (Directors and above) are Black.  As a result, employees labeled the Firm "WhiteRock."

5.      This systemic discrimination is particularly egregious within BlackRock's United States Wealth Advisory ("USWA") group.  The head of the group, Martin Small, is a white man. All nine of Small's direct reports are white.  The group does not include a single senior Black woman.  In the past six years, USWA has not promoted a single Black employee to Director.  The sole Black woman promoted to Vice President (one level below Director) had twice the experience of the group's comparable white employees.

6.      USWA is not alone.  As BlackRock's Head of Employee Relations Tara Williams admitted, she could provide a "list" that was "pages long of managers [at BlackRock] who've probably never had a person of color working with them."

7.      These abysmal numbers are neither inevitable nor the result of some clandestine hidden force.  They are the product of innumerable managerial decisions, both large and small, that systemically weigh down the careers of Black and female employees.  They are also the consequence of active neglect.

8.      Each time a manager purports to "listen" when a Black employee shares her struggles but does nothing in response – or worse, attempts to force the employee out – causes the Firm to become whiter and more male.

9.      In the end, Black employees must work harder and achieve more in order to reach the same heights as their white colleagues, regardless of their place within the Firm's hierarchy. For example, a senior Black executive expressed frustration that he had to threaten to quit before BlackRock permitted him to sit on the Firm's Operating Committee.  Similarly, a Black intern who was universally deemed to be an outstanding performer was almost not hired to a permanent position because white employees expressed vague and inexplicable concerns that the Black intern was not "professional" enough.

10.     Brittanie McGee is one of these employees.  From 2014 to 2020, McGee excelled as a financial services professional at BlackRock.  However, she was forced to stand by as BlackRock gave her white male colleagues more desirable assignments, higher pay and promotions while telling McGee – falsely – that she either was being considered for an opportunity or that BlackRock policy prevented her from advancing.

11.     For example, in 2018, McGee's supervisor stated that McGee could not be promoted because she had not been in her existing role long enough.  She later learned that BlackRock promoted a white man with similar tenure.

12.     McGee faced additional hurdles because she is a woman.  In particular, almost all of the white coworkers who zoomed past her in the corporate hierarchy were men.

13.     McGee tried, repeatedly, to remedy the problem or, at least, get answers as to why she was being blocked, only to be met with hostility or indifference.  For example, McGee was instructed by a BlackRock executive not to "raise [her] issues" to a higher level within the Firm.  Another supervisor snapped that he did "not have to explain" himself to McGee when she asked why he misled her about the promotion process.  Yet another supervisor responded to McGee's report that she had been sexually harassed by stating that "girls" should not be in the same room with their harassers.  At best, McGee was instructed to be patient and wait until next year.

14.     McGee's appeals to Human Resources ("HR") only made things worse.  Initially, BlackRock's HR representatives promised to "look into" McGee's complaints of discrimination, only to predictably dismiss McGee's concerns out of hand.

15.     Eventually, BlackRock made it clear that it wanted McGee to leave.  The Firm urged McGee to give up her responsibilities and look for another job, either within or outside the Firm.  McGee understood that if she could not find a new position by BlackRock's deadline, she

would have to leave.  The Firm made clear, however, that if McGee decided to stay in her then role, she would be considered an "anomaly" and face challenges.  Moreover, McGee was warned that if she did not leave, she would have to demonstrate a "commitment" to the Firm.

16.     In several remarkable moments of candor, Williams admitted that "most managers at this firm [BlackRock] are failing" at diversity and inclusion, including BlackRock's CEO, Fink. Williams further described BlackRock's failure at diversity as "pathetic" and admitted that the problem was so systemic that it even infected HR.  Williams described BlackRock's attitude towards its predominantly white workforce and failure to provide equal opportunities to employees of color as "convenient ignorance."

17.     While McGee tried to make the best of things and continue at the Firm, ultimately, BlackRock broke McGee and forced her to quit.

18.     McGee brings this action seeking declaratory, injunctive and equitable relief, as well as monetary damages, to redress BlackRock's violations of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); the New York State Human Rights Law, Executive Law § 290 *et seq.* (the "Executive Law"); and the Administrative Code of the City of New York § 8-107 *et seq.* (the "City Law"); the Equal Pay Act, 29 U.S.C. § 206 *et seq.* ("EPA"); the New York State Pay Equity Law, N.Y. Lab. Law § 194 *et seq.* ("NYSPEL").

## JURISDICTION AND VENUE

19.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981 and the EPA.

20.     This Court has supplemental jurisdiction over Plaintiff's related state and city claims pursuant to 28 U.S.C. § 1367(a).

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this district.

22.     Pursuant to NYCHRL § 8-502, Plaintiff will serve a copy of this Complaint on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

## PARTIES

23.     Plaintiff Brittanie McGee is a resident of New York, New York.  At all relevant times, McGee was an "employee" of BlackRock as defined by the applicable statutes.

24.     Defendant BlackRock is a foreign business corporation organized under the laws of the State of Delaware, with a principal place of business located at 55 East 52nd Street, New York, New York 10055.  At all relevant times, BlackRock was an "employer" within the meaning of all applicable statues.

## FACTUAL ALLEGATIONS

I.     **A Sea of White Faces**

25.     In 2013, McGee graduated from the University of Tennessee with a Bachelor of Arts in Economics.

26.     In December 2014, after a short stint at Invesco where McGee was an Associate RFP Specialist, she accepted a position at BlackRock as an Associate in Relationship Management, reporting to Matt Koth.

27.     When McGee arrived, she was the only Black employee in a sea of white faces on the 25th floor where she worked, except for a single administrative assistant.

28.     McGee and a fellow Black analyst, who joined the group in January 2015, were routinely excluded from social events, such as happy hours.

29.     In contrast to her white co-workers, McGee was not asked to participate in Firm initiatives, such as planning offsites, client and charity events.

30.     Frustrated, McGee protested to Koth who claimed he was unsure what to do but offered to speak to his boss, Managing Director Scott Reeder.  McGee never heard back.

**II.**     **<u>"We Really Shouldn't Put Girls in the Same Room as FAs."</u>**

31.     In the fall of 2016, McGee was finally invited to an event.

32.     Robert Eaton, the Head of National Accounts, asked McGee's team to attend an outing with Financial Advisors ("FAs") from UBS.[1]

33.     During the event, which was held in the private room of a restaurant, several of the UBS FAs solicited McGee to go out with them to have "fun."

34.     One FA openly announced his intention to go home with McGee and "climb into her bed."

35.     McGee felt humiliated and reported the conduct to Koth who, once again, did nothing.

36.     Koth instead responded, "we really shouldn't put girls in the same room as FAs."

37.     To Koth, McGee was merely a "girl" who should remain back at the office.

---

[1]     McGee later learned that she was not Eaton's first choice. He needed attendees because several members of his team were unavailable.

III.   **McGee Performs Two Jobs**

38.    In 2016, McGee learned that BlackRock was building a new group focused on alternative (i.e., non-traditional) securities.  Desperate to advance her career and shed the sexist "girl" stereotype, McGee asked Reeder to join the new team.

39.    Reeder agreed but told McGee that she would have to continue to perform her existing responsibilities.  In effect, McGee was required to perform two jobs.  According to Reeder, once the alternatives team was formally announced, McGee would become a member.

40.    In the fall of 2017, BlackRock approved the budget and headcount for the alternatives group, including two associate level slots.

41.    Reeder, however, reneged on his promise.  He told McGee that she was expected to continue to perform both jobs, one as a member of the "broader team" and a second with the alternatives group.

42.    BlackRock did not require any of the other alternative team members – all of whom were white men – to perform two roles.

43.    Moreover, neither Adam Bobker (head of the alternative sales desk) nor John Diorio (alternative products team leader) had a single woman or person of color reporting to them.

44.    Upon information and belief, to this day, Bobker has never hired a person of color.

IV.   **Do Not "Raise Your Issues"**

45.    On May 2, 2018, McGee had coffee with Sarah Hallac, Senior Advisor at BlackRock and the widow of former BlackRock Co-President Charlie Hallac.

46.    McGee shared her negative experiences at BlackRock.  McGee told Hallac that she had been excluded because of her race and that Koth ignored her complaints of race discrimination and sexual harassment.

47.     Hallac spoke to Eaton, Reeder's manager, to remedy the problem.

48.     The next day, McGee was told that she would no longer have to perform two jobs and could work solely with the alternatives team.

49.     Eaton, unhappy that McGee complained about discrimination, warned McGee that she should not "raise [her] issues" with "someone like Hallac."

**V.     I Don't Have to Explain Myself to You**

50.     In the middle of 2018, McGee earned her typical stellar mid-year review, which included earning an award for "most valuable win."

51.     McGee approached Reeder and asked to be promoted to Vice President, a process that typically takes several months and begins in the middle of each calendar year.

52.     McGee pointed out that, as a result of her hard work, the alternatives business had grown from $100 million (2016) to $1 billion (2017).   Reeder agreed that McGee merited a promotion.

53.     According to Reeder, however, McGee did not meet the minimum qualifications for a promotion because she was not in her "role" on the alternatives team for at least a year.   In fact, Reeder knew that McGee had been working with the alternatives team for approximately a year, in addition to performing her other tasks.

54.     Nonetheless, Reeder feigned benevolence and told McGee that he would put her up for a promotion, making it appear as if he was doing her a favor.

55.     Exhausted by the constant struggle to move up within the predominately white male hierarchy, but excited that she would finally have a chance, McGee offered to identify for Reeder her three "stakeholders," which she understood was a necessary part of the promotion process before committee approval.

56.     Reeder refused and assured McGee that she did not need "stakeholders" because the VP promotion process was "automatic."

57.     BlackRock, however, declined to promote McGee.

58.     The Firm did, however, promote Mike Valenti, a white man who had been with the USWA team for half a year and generated only a fraction of the revenue that McGee did.[2]

59.     McGee also learned that Reeder lied to her about the process.  McGee did, in fact, need to provide three "stakeholders" in order to be considered for a promotion.

60.     Indeed, the Firm refused to even interview McGee, which was another necessary part of the promotion process.

61.     McGee confronted Reeder and asked why the committee decided not to promote her.

62.     Reeder admitted that McGee's promotion never reached the committee because he personally decided not to promote her.

63.     McGee asked how Reeder could have promoted Valenti but not her.  Reeder snapped that he "did not have to explain [him]self" to McGee.

**VI.**    **Wait Until Next Year**

64.     Feeling hopeless, on December 12, 2018, McGee met with Salim Ramji, Senior Managing Director and then Head of USWA.

65.     McGee explained how she had been excluded because of her race, sexually harassed, Koth's indifference to the sexual harassment and discrimination, and Reeder's discriminatory failure to promote her.

---

[2]     McGee later learned that only the male members of Reeder's team were given the opportunity to interview Valenti.

66.     McGee also stated that she had been retaliated against for reporting this unlawful conduct to Hallac and Eaton.

67.     Ramji put McGee off yet again, suggesting that they meet with Reeder in January and develop a promotion plan for "next year."

68.     On January 8, 2019, McGee met with Ramji and Reeder, after which she felt somewhat positive.

69.     However, Ramji promptly took another position within BlackRock and was replaced by Small.

## VII.   What Do You Want Me to Do?

70.     BlackRock's discriminatory and retaliatory treatment of McGee escalated.  Two managers in McGee's group, Bobker and Diorio, continued to exclude McGee from client meetings, instead inviting Jack Barlow, yet another newly hired white man, who, at times, made McGee feel uncomfortable by often sitting on her desk and standing close to her.[3]

71.     McGee protested repeatedly to Reeder, stating that she was being ignored because she is a woman of color.

72.     Reeder suggested that McGee was either imagining the unlawful treatment or making it up, stating that Bobker and Diorio had "never excluded" him.  (Reeder, of course, is a white man.)

73.     Reeder next asked McGee what she expected him to do.  He also claimed to have spoken to Bobker and Diorio about their conduct, but nothing changed.

---

[3]     McGee's complaints about Barlow were met with laughter.

## VIII. __Unequal Pay__

74.     Upon information and belief, BlackRock also paid McGee less than white male employees who performed the same work.

75.     Barlow was responsible for distribution, product development, product strategy and investor relations.   McGee had the same responsibilities.   Moreover, both worked from BlackRock's New York City office and reported to Reeder.

76.     Indeed, McGee performed Barlow's job prior to BlackRock hiring Barlow in 2018. Thereafter, Barlow and McGee split coverage on larger clients such as Morgan Stanley and UBS.

77.     McGee often had to perform additional tasks to cover for Barlow, such as due diligence and capital calls.

78.     BlackRock budgeted $1 million for Barlow's position and, upon information and belief, paid Barlow total compensation of between $500,000 and $700,000 annually.

79.     BlackRock paid McGee $162,000 in 2019.

80.     McGee also performed the same job as Ryan Zirkle.  Both were responsible for "active funds," both worked from the New York City office and both reported to Reeder.

81.     Upon information and belief, BlackRock paid Zirkle double what it paid McGee.

82.     McGee also performed the same job as Bill Monahan and Valenti.  Once again, all three worked form New York City and reported to Reeder.

83.     Indeed, McGee had more seniority than Monahan, whom BlackRock hired in 2015, and was trained by McGee.

84.     McGee and Monahan also handled similar clients, such as Morgan Stanley.

85.     McGee also had more seniority than Valenti, who only joined McGee's team in 2018.

86.     Upon information and belief, BlackRock paid Monahan and Valenti between $50,000 and $100,000 more than McGee annually.

87.     McGee was not the only Black employee paid less than her white counterparts.  For example, one of McGee's few Black colleagues discovered that BlackRock paid his less qualified and less-senior white co-worker who previously occupied his desk a 10% higher salary and a 200% higher bonus.

IX.    <u>We'll "Look into It"</u>

88.     On May 16, 2019 and July 18, 2019, McGee complained to Sam Engel and Alex Reynolds in HR.

89.     Each time, the response was the same.  BlackRock's HR representatives would listen, take notes and ask McGee to wait while they "looked into it."

90.     McGee waited patiently but no substantive response came.

91.     To the contrary, McGee's complaints only made things worse.  Despite BlackRock's purported "plan" to promote McGee to VP in 2019, Reeder again refused to promote McGee and instead retaliated against her by baselessly downgrading her performance rating for the 2019 calendar year.

92.     Unsure what to do, McGee met with her mentor, a Black senior executive at the Firm, to express her frustration.

93.     Her mentor, one of BlackRock's few high-level Black executives, was baffled as to why or how McGee had not been promoted given her significant contributions to the success of the alternatives business.

94.     He admitted to McGee that BlackRock consistently gave opportunities to the "same group of white employees."

95.     He further confessed that even though he was one of BlackRock's largest producers, he had to threaten to quit before BlackRock honored his contributions and promoted him to the Firm's Operating Committee.

96.     McGee and her mentor were not the only Black employees who had to fight to advance at BlackRock.  In 2017, many of McGee's white team members in USWA refused to recommend that a Black intern be offered a permanent position.  The team agreed that the intern's work was impeccable yet claimed that the intern lacked "professionalism."  One white team member admitted that he never spent time with the intern but had only "heard" about issues with the intern's "professionalism."  BlackRock only extended an offer after McGee protested that the purported concern about the intern's "professionalism" was a dog whistle for not adhering to white standards.

97.     In an attempt to help, McGee's mentor expressed his concerns about the discriminatory treatment McGee suffered to Williams, BlackRock's Head of Employee Relations.

98.     McGee met with Williams and, yet again, explained the long history of discriminatory and retaliatory treatment she had suffered.

99.     Predictably, Williams promised to "look into it."

100.    Without so much as an investigation, Williams responded to McGee that there was no discrimination because Bobker and Diorio were merely "disappointed" in McGee.

## X.      Sixty Days to Look for a New Job

101.    In February 2020, McGee, once again, met with Williams to discuss McGee's complaints of discrimination and retaliation.

102.    This time BlackRock responded.  Unfortunately, the Firm's solution was to pressure McGee to quit.

103.     BlackRock urged McGee to relinquish her responsibilities and take 60 days to look for a new job, either within BlackRock or with another institution, and, if nothing could be found, separate from the Firm.

104.     McGee understood that any agreement to cut ties with BlackRock would require McGee to waive her legal claims.

105.     According to Williams, if McGee decided to stay, McGee would face "challenges" because she was as an "anomaly."  Moreover, to continue at BlackRock, McGee would have to demonstrate a "commitment" to her team.

106.     McGee refused to be pushed out.

107.     McGee protested to Williams that there had never been a "knock" on her "deliverables."

108.     She reminded Williams that her complaints of discrimination were consistently "brushed under the rug."

109.     In a remarkable moment of candor, Williams admitted that "most managers at this firm are failing" at diversity and inclusion, including BlackRock's CEO, Fink.  Williams further described BlackRock's failure at diversity as "pathetic" and admitted that the problem was so systemic that it even infected HR.  Williams stated that she could provide a "list" that was "pages long of managers who've probably never had a person of color working with them."

## XI.     BlackRock Suddenly "Commits" to Combatting Racism

110.     In the spring of 2020, George Floyd was killed and the country erupted in a rush of social justice protests.

111.     Suddenly, BlackRock pretended to care.  Each division leader sent out an email with carefully crafted platitudes about how the Firm stands behind its Black colleagues.

112.    Fink held a global town hall, stating that he was shocked to learn that Black employees were not having the same experiences as their white counterparts.

113.    Fink claimed to be perturbed that the Firm's Black employees were not advancing as rapidly as its white employees.

114.    Given her experience, McGee was stunned by the Firm's dishonesty.  She had been complaining about BlackRock's discriminatory conduct since 2016.  Her complaints only made things worse.

115.    Despite the threat to her career, McGee persisted in pushing for real change, in contrast to the Firm's self-serving public relations campaign.

116.    McGee responded by sending an email to Small, the new head of USWA, who was, predictably, another white man.

117.    McGee was frank, telling Small that "[h]onest conversations" and "sharing" were not going to "fix the structural issues that hold back black employees or cause them to get frustrated and leave."  She pointed to a "system that historically neglected to elevate and support its black employees."

118.    McGee supported her argument with a series of disturbing facts, such as that USWA did not promote its first Black employee to Managing Director until 2020; the division had never promoted a Black person to Director; and, since approximately 2015, McGee was aware of only one Black employee promoted to VP (2019) who, unsurprisingly, had twice the experience of her white colleagues.

119.    McGee explained that while she was "glad BlackRock is waking up and acknowledging what it is like to be black in America," she was "tired."

120.     In a remarkable summary of her exasperating experience at BlackRock, McGee told Small:

> I'm tired of having to show up and pretend to be happy in an environment that is hostile towards black women and does not support us.  I'm tired of being considered difficult, a threat or the "angry black woman" when I've shown or voiced my frustration from being excluded, bullied, ignored and overlooked.   I'm exhausted from dealing with this frustration for almost 6 years. Finally, I'm tired because now I'm being told patience is required while the firm is trying to understand racism and the onus is on me to educate my newly awake colleagues via discussion groups. We can have discussions all day, but what I'd like to know is how USWA is going to do better and be better.

121.     McGee's plea fell on deaf ears.  Small responded by promoting BlackRock's "discussion groups" and "inclusive conversations."

122.     Small placed the onus on McGee, and presumably other Black employees, to be "role-model[s] for [him]" so that he could "better educate [him]self" and "better understand the experience of our black employees."  In typical BlackRock fashion, Small expected McGee to be patient, telling her "[m]ore to come."

123.     Remarkably, Small referred McGee to HR, yet again.

**XII.   Convenient Ignorance**

124.     In or around early July 2020, McGee met once again with Williams to discuss discrimination and retaliation.

125.     McGee told Williams that BlackRock's newly-announced efforts to promote diversity and inclusion were "nonexistent" in USWA.

126.     Williams did not deny McGee's observation.  To the contrary, she described BlackRock's attitude towards its predominantly white workforce and failure to provide equal opportunities to employees of color as "convenient ignorance."

127.    McGee also told Williams that there had been no progress addressing McGee's complaints of intentional exclusion and isolation – that "nothing has gotten better."  In fact, McGee stated that it was "easier for them to exclude" her now because employees were no longer working in the office due to COVID-19.

128.    In contrast to her experience as a Black female member of the team, McGee told Williams that a less senior white coworker was consistently included in communications while she was excluded.

129.    Williams responded that McGee wanted to "see more Black people" at BlackRock in order to "feel better."

130.    McGee immediately shot down Williams's attempt to minimize the problem. McGee stated that BlackRock needed to "look at the problems" and "own the mistakes."  To once again highlight specific examples, McGee emphasized the different rate of promotion for Black employees as well as BlackRock's failure to provide Black employees with "opportunities, projects, or visibility."  Additionally, McGee reiterated that Black employees were "ignored" and "excluded" – a practice that McGee told Williams she encountered for her "entire career" at BlackRock.

131.    Williams, once again, directed the conversation toward McGee's inevitable departure from BlackRock.  Williams asked how long McGee thought she could continue on her current path at the Firm.  Williams stated that she (Williams) did not know how she "would be able to stay at a place that I felt the way you [McGee] feel about BlackRock."

XIII.    **Reeder Admits that McGee has Exemplary Performance**

132.    On or around July 22, 2020, McGee met with Reeder for her 2020 mid-year performance review.

17

133.    Reeder praised McGee's performance, admitting that when he gives McGee a task he knows "it's going to get done" and "get done well."

134.    Reeder's praise of McGee's performance stood in sharp contrast to his retaliatory downgrading of McGee's performance rating in McGee's previous annual review, as well as his denials of promotions to McGee for over two years.

135.    Nevertheless, McGee left the call knowing that regardless of her performance she would not have the same opportunity to advance as her white male colleagues.

**XIV.   BlackRock Forces McGee Out**

136.    Later that summer, BlackRock decided to focus on Black-owned busines initiatives by launching the BlackRock Impact Opportunities fund.

137.    McGee asked to be included in the initiative but was told that there would be no new "headcount" created for the fund.

138.    As a result, McGee's managers and colleagues – who had discriminated and retaliated against her – would be BlackRock's ambassadors for inclusion.

139.    Exhausted, McGee had no choice but to leave the Firm.

**FIRST CAUSE OF ACTION**
**(Discrimination in Violation of Section 1981)**

140.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as if fully set forth herein.

141.    By the acts and practices described above, Defendant has discriminated against Plaintiff in the terms and conditions of her employment on the basis of her race in violation of Section 1981.

142.    Defendant knew that its action constituted unlawful discrimination under Section 1981 and/or acted with malice or reckless indifference to Plaintiff's statutorily protected rights.

143.    As a result of Defendant's discriminatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and damage to her reputation unless this Court grants relief.

**SECOND CAUSE OF ACTION**
**(Retaliation in Violation of Section 1981)**

144.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

145.    By the acts and practices described above, Defendant retaliated against Plaintiff for protesting race discrimination in violation of Section 1981.

146.    Defendant knew that its actions constituted unlawful retaliation under Section 1981 and/or acted with malice or reckless indifference to Plaintiff's statutorily protected rights.

147.    As a result of Defendant's retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and damage to her reputation unless this Court grants relief.

**THIRD CAUSE OF ACTION**
**(Discrimination in Violation of the Executive Law)**

148.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

149.    By the acts and practices described above, Defendant discriminated against Plaintiff on the basis of her race and sex in violation of the Executive Law.

150.    Defendant knew that its actions constituted unlawful discrimination under the Executive Law and/or acted with malice or reckless indifference to Plaintiff's statutorily protected rights.

151.     As a result of Defendant's retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and damage to her reputation unless this Court grants relief.

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the Executive Law)

152.     Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

153.     By the acts and practices described above, Defendant retaliated against Plaintiff for protesting race and sex discrimination in violation of the Executive Law.

154.     Defendant knew that its actions constituted unlawful retaliation under the Executive Law and/or acted with malice or reckless indifference to Plaintiff's statutorily protected rights.

155.     As a result of Defendant's retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and damage to her reputation unless this Court grants relief.

## FIFTH CAUSE OF ACTION
### (Discrimination in Violation of the City Law)

156.     Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

157.     By the acts and practices described above, Defendant discriminated against Plaintiff in the terms and conditions of her employment on basis of her race and sex in violation of the City Law.

158.     Defendant knew that its actions constituted unlawful discrimination under the City Law and/or acted with malice or reckless indifference to Plaintiff's statutorily protected rights.

159.    As a result of Defendant's discriminatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and damage to her reputation unless this Court grants relief.

## SIXTH CAUSE OF ACTION
### (Retaliation in Violation of the City Law)

160.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

161.    By the acts and practices described above, Defendant retaliated against Plaintiff for protesting race and sex discrimination in violation of the City Law.

162.    Defendant knew that its actions constituted unlawful retaliation under the City Law and/or acted with malice or reckless indifference to Plaintiff's statutorily protected rights.

163.    As a result of Defendant's retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and damage to her reputation unless this Court grants relief.

## SEVENTH CAUSE OF ACTION
### (Discrimination in Violation of the EPA)

164.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

165.    By the acts and practices described above, Defendant violated the EPA by paying male employees higher wages than Plaintiff for substantially equal work in a job which required equal skill, effort and responsibility, and which was performed under similar working conditions.

166.    Defendant's conduct was willful and it knew that its actions constituted unlawful violation of equal pay laws and/or showed reckless disregard for Plaintiff's statutorily protected rights.

## EIGHTH CAUSE OF ACTION
### (Discrimination in Violation of the NYSPEL)

167.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

168.    By the acts and practices described above, Defendant violated the NYSPEL by paying male and white employees higher wages than Plaintiff for substantially similar work based on a composite of skill, effort and responsibility, and which was performed under similar working conditions.

169.    Defendant's conduct was willful and it knew that its actions constituted unlawful violation of equal pay laws and/or showed reckless disregard for Plaintiff's statutorily protected rights.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate federal, state and city laws;

B.    An injunction and order permanently restraining Defendant and its partners, officers, owners, agents, successors, employees and/or representatives and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.    An order directing Defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

D.    An award of damages against Defendant in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

22

E.      An award of damages against Defendant in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages;

F.      An award of punitive damages;

G.      Prejudgment interest on all amounts due;

H.      An award of costs that Plaintiff incurs in this action, as well as an award of reasonable attorneys' fees to the fullest extent permitted by law; and

I.      Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: January 27, 2021
          New York, New York                        Respectfully submitted,

                                                    **WIGDOR LLP**

                                            By: _____
                                                    Valdi Licul
                                                    Alfredo J. Pelicci

                                                    85 Fifth Avenue
                                                    New York, NY 10003
                                                    Telephone: (212) 257-6800
                                                    Facsimile: (212) 257-6845
                                                    vlicul@wigdorlaw.com
                                                    apelicci@wigdorlaw.com

                                                    *Counsel for Plaintiff*